

U.S. Department of Justice

United States Attorney
Eastern District of New York

ABS:SWR/AJE
F. #2013R00183

271 Cadman Plaza East
Brooklyn, New York 11201

August 24, 2020

By ECF

The Honorable Ann M. Donnelly
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:    United States v. Aleksandr Pikus, et al.,
                Criminal Docket No. 16-329 (AMD)

Dear Judge Donnelly:

      On November 15, 2019, following a six-day jury trial and approximately two hours of deliberations, the defendant Aleksandr Pikus was convicted of Counts One through Five of the Indictment,[1] which charged him with money laundering conspiracy (Count One) in violation of 18 U.S.C. § 1956(h), two substantive counts of money laundering (Counts Two and Three) in violation of 18 U.S.C. § 1956(a)(1)(B)(i), conspiracy to receive and pay health care kickbacks (Count Four) in violation of 18 U.S.C. § 371, and conspiracy to defraud the United States by obstructing the lawful functions of the Internal Revenue Service (the "IRS") in violation of 18 U.S.C. § 371 (Count Five). The defendant is currently scheduled to be sentenced on August 31, 2020.

---

[1] The jury verdict form and version of the indictment provided to the jury used Counts One through Five as identified above, as the original indictment also charged four co-defendants who did not proceed to trial. In the original indictment, the defendant was charged in Count One (money laundering conspiracy), Counts Two and Three (substantive money laundering), Count Ten (conspiracy to receive and pay health care kickbacks) and Count Eleven (conspiracy to defraud the United States by obstructing the lawful functions of the IRS). For consistency with the jury's verdict form, this memorandum will use the numbering of the jury's version of the indictment (i.e., Counts One through Five).

The government respectfully submits this letter to aid the Court in calculating the defendant's United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") range and arriving at an appropriate sentence in this case. In light of the seriousness of these offenses, the critical role that the defendant played in the charged schemes, and the harms caused to the Medicare and Medicaid systems—vital federal benefit programs— and to the integrity of the financial system and the United States Treasury, the defendant should be sentenced to a significant prison term within the Guidelines range calculated by the Court.

I.    Background

The overwhelming evidence at trial established that the defendant was at the center of a massive scheme to steal tens of millions of dollars from the Medicare and Medicaid programs, disguise and conceal the proceeds of the scheme, and keep as much of the proceeds for the participants by hiding information from the IRS. (April 15, 2020 Presentence Investigation Report ("PSR") ¶ 21).[2] This scheme generally followed the following steps:

First, the defendant and his co-conspirators paid cash kickbacks to ambulette[3] drivers and others in return for referring and Medicare and Medicaid beneficiaries to clinics in Brooklyn and Queens. (PSR ¶ 22).

Second, the defendant and his co-conspirators paid and caused to be paid cash kickbacks to beneficiaries to induce those beneficiaries to subject themselves to purported treatments at those clinics. This included services such as purported physical and occupational therapy, that were medically unnecessary and falsely and fraudulently billed to Medicare and Medicaid (such as group exercises instead of one-on-one therapy, or services purportedly rendered by unlicensed aides instead of licensed therapists). (PSR ¶ 23).

Third, after claims for these purported services were submitted to Medicare and Medicaid, reimbursement funds were deposited in the accounts of co-conspirator health care providers. Those providers—in return for the referral of beneficiaries—kicked back significant portions of those proceeds to the defendant and his co-conspirators by writing checks to various shell companies. (PSR ¶ 24).

Fourth, the defendant and his co-conspirators used these shell companies to cash many of these checks at check-cashing businesses around New York City in order to

---

[2] The defendant filed objections to the PSR on June 10, 2020 (Docket Entry ("D.E.") # 432); the government responded on June 26, 2020 (D.E. # 434). On July 9, 2020, the Probation Department provided the parties with an addendum to the PSR, in which the Probation Department reviewed the defendant's objections and concluded that the relevant information should remain in the PSR.

[3] An ambulette company transports people to and from their medical appointments. (Tr. 1126).

conceal, among other things, the nature of the payments and the use of the proceeds to pay illegal kickbacks. In addition, the defendant and his co-conspirators also sometimes wrote checks among the shell companies to further disguise the criminal proceeds. Some of the cash generated by the extensive check-cashing operations was in turn used to pay additional kickbacks for patient referrals and further the fraud. (PSR ¶ 25).

Fifth, the defendant and his co-conspirators concealed the funds generated from the check-cashing operations by filing false returns with the IRS, omitting or misreporting the cashed funds on the relevant tax forms. (PSR ¶ 26).

A.   The Clinics Generated Business through Bribes and Kickbacks

The evidence at trial set forth a massive kickback scheme at medical clinics in Brooklyn and Queens. Witnesses testified at trial about how they began working for the defendant, first at a clinic on Surf Avenue (the "Surf Avenue Clinic"), and then how operations expanded to include clinics at Neptune Avenue (the "Neptune Avenue Clinic"), East 15th Street (the "East 15th Street Clinic"), Brighton 4th Street (the "Brighton 4th Clinic"), Brighton 6th Street (the "Brighton 6th Clinic"), among other locations (collectively, the "Pikus Clinics"). (Tr. 115-19, 1131-32, 992-93; PSR ¶ 27). The Pikus Clinics were operated and managed by the defendant and his co-conspirators, including purported clinic managers Mark Tsyvin, Roman Azimov, Max Vernik, Denis Satyr, Eugene Sudman (also known as "Zub," Russian for "Tooth"), Malvina Yablonskaya, and Moshe Izgelov among others. (Tr. 1131-32; see also Tr. 115-19, 146, 398-99, 993-94, 1024; PSR ¶ 27).

In approximately 2008 or 2009, the defendant explained to Oleg Rubenov, an ambulette driver, how the patients would be paid for different services at the defendant's clinic; for example, if the patients came for physical therapy, they would get $30 or $35 as payment. (Tr. 984; PSR ¶ 28). Rubenov testified how each week, the defendant gave him thousands of dollars in cash for the patients along with information for the patients, such as their names and phone numbers. (Tr. 984-85, 991, 1022-23; PSR ¶ 28). The defendant did this himself for about two or three years, and then the defendant told Rubenov that Roman Azimov would be new manager of the clinic; but whenever Rubenov had any issues with the operations, like Azimov not paying for patients on time, Rubenov called the defendant to resolve the issue. (Tr. 991-93, 1022-23; PSR ¶ 28). Eugene Sudman was another manager who gave Rubenov cash to pay patients, and when Rubenov had an issue with Sudman, such as not bringing cash on time, Rubenov called the defendant to resolve it. (Tr. 1024-25; PSR ¶ 28).

Roman Azimov testified that for each of the Pikus Clinics he managed, he took checks from the health care providers, cashed their checks, and then provided cash to the ambulette drivers to bring them patients. (Tr. 1145-48; PSR ¶ 29). The defendant and his co-conspirator managers collected these checks from several co-conspirator health care providers, including: Oleg Dron, Amgad Mikhail, Eduard Noykhovich, Wael Bakry, Abraham Demoz, Victor Genkin, Mayura Kanekar and Alexander Khavash. (Tr. 1157-62; PSR ¶ 29). Oleg Dron, one of these providers, testified at trial about his understanding that

he would pay so-called management companies to cover the office expenses, including "patients coming into the office." (Tr. 387; PSR ¶ 29).

At the Pikus Clinics, although there were various managers, co-conspirators, including Oleg Dron, understood that the defendant was in charge. (Tr. 391; PSR ¶ 30). Providers like Dron claimed to see about 20 patients a day, but they did not actually see them one-on-one; instead, the therapists saw two or three patients at a time. (Tr. 391-92; PSR ¶ 30). And it was the defendant himself who encouraged Dron to see more than one patient for treatment at a time, because otherwise they would only be able to see about eight patients a day. (Tr. 461; PSR ¶ 30). The defendant also asked Oleg Dron to help with the billing by another therapist, Mayura Kanekar, because "she had too many patients at the location at that time," but Dron was not personally treating those patients himself. (Tr. 398; PSR ¶ 30).

      B.    <u>The Defendant's Elaborate Money Laundering Operations</u>

The defendant was at the center of an elaborate system disguising and concealing the money that the clinics made off the Medicare and Medicaid programs. The defendant and his co-conspirator Mark Tsyvin explained to Roman Azimov how the financial operations of the scheme worked. After patients came to the clinic, the scheme participants would bill the insurance provider—predominantly Medicare and Medicaid. (Tr. 1114-16; PSR ¶ 31). The licensed providers received the billings, keeping a portion (typically 10% after certain expenses), and then gave the rest to the defendant and his co-conspirators' companies. (Tr. 1117-18; <u>see also</u> 386-87; PSR ¶ 31). The evidence at trial showed the elaborate lengths the defendant went to in disguising the money these providers transferred to the defendant and his co-conspirators.

The defendant was instrumental in setting up a vast network of shell companies. The defendant directed co-conspirators, including Roman Azimov, to open multiple companies. (Tr. 1119; PSR ¶ 32). These companies had names suggesting they provided some kind of legitimate services, such as consulting, marketing, staffing, management or research. For example, the defendant owned shell companies "Advanced Carrier Opportunity LLC," "Bee Nurse Employment Solutions, Inc.," "National Research Group LLC," and "Project Design A2Z LLC." (GX 2001; PSR ¶ 32). Co-conspirators had many more. For example, Azimov had "Surf Consulting Group," "Neptune Consulting Services Inc.," and "R.E.M.M. Research & Marketing Inc."; Denis Satyr had "Kings Boro Management Corp."; Eugene Sudman ("Zub") had "Prime Care Medical Management Inc." (GX 2001; PSR ¶ 32). The defendant and his co-conspirators used their shell companies to spread around the huge sums that health care providers were writing to them in the hopes of avoiding detection. Indeed, the defendant and others discussed the need to diversify the companies they were using, including opening companies in Azimov's wife's name. (Tr. 1120-21; PSR ¶ 32). Sometimes, the medical providers facilitated this—writing checks that left the name of the payee blank for the defendant and his co-conspirators to fill out themselves. For example, Oleg Dron testified how he sometimes wrote these partially blank checks, and then later wrote the name of the payee on the blank part of his carbon copy when he learned it from one of the managers. (Tr. 407-08; GX 801, 801-A; PSR ¶ 32).

4

The scheme participants needed all these companies in order to receive money from health care providers so that it could be converted to cash at the various check-cashing locations in such a way that they could hide what was going on and where the money was going. (Tr. 1121-22, see also Tr. 121-22; PSR ¶ 33). As Roman Azimov explained: "[O]nce the store cashed checks for that corporation we didn't want to have any red flags with the location or reporting for that matter." (Tr. 1125; PSR ¶ 33). Specifically, the defendant explained to Roman Azimov how these checks were to be spread across companies and kept under $10,000. (Tr. 1125; PSR ¶ 33). The defendant and Mark Tsyvin also explained to Denis Satyr that they could not write more than $10,000 each week from company to company "[b]ecause it would raise a red flag." (Tr. 129; PSR ¶ 33). The defendant and others told Satyr that if they were cashing multiple checks, they were supposed to be less than $10,000 together. (Tr. 130-31; PSR ¶ 33).

In addition to cashing checks from health care providers, the defendant and co-conspirators engaged in a further layer of concealment by cashing checks from one another's companies. As Roman Azimov explained, once a provider had already written checks up to the conspiracy's self-imposed $10,000 limit, the managers had to deposit the money and write a check to a different shell company so that the second company could take it to a check-cashing location. (Tr. 1128; PSR ¶ 34). Thus, for example, the defendant and his co-conspirators wrote checks to Roman Azimov, and Roman Azimov did the same for them; this was done not in return for a legitimate service, but instead "to disguise the money." (Tr. 1128-29; PSR ¶ 34). The evidence at trial also included numerous examples of checks between an individual's own companies—for example, two checks between the defendant's own companies. (See, e.g., GX 201 at 20 ($9,500 check from Bee Nurse Employment Solutions to Advanced Carrier Opportunity); PSR ¶ 34).

It took time and money for the defendant and his co-conspirators to divide up these checks and cash them in this way. Each time a check was cashed, the check-cashing stores charged a fee—typically anywhere from two to five percent of the value of the check. (Tr. 1129; PSR ¶ 35). Denis Satyr explained how even though a bank would not have charged them this fee for cashing checks, they could not go to the bank "[b]ecause it would raise a red flag; you're not supposed to do that." (Tr. 126-27). The defendant and his co-conspirators used multiple check-cashing locations throughout different parts of New York City: in Brooklyn, Manhattan and Queens. (Tr. 1133-34; see also Tr. 123-25; PSR ¶ 35). Denis Satyr testified how he spent hours driving between different check-cashing locations each week. (Tr. 124-25; PSR ¶ 35).

After the cash was generated in this way, the defendant and his co-conspirators, including Roman Azimov, Mark Tsyvin, Malvina Yablonskaya, and others, would meet to go through the cash together. These meetings typically occurred at the defendant's billing office, where they would "sort out the amounts of money as it pertains to each location." (Tr. 1152; PSR ¶ 36). They then used some of this cash to pay ambulette drivers for bringing patients to the defendant's clinics. (Tr. 1126; see also Tr. 123; PSR ¶ 36). Generally, the defendant and his co-conspirators paid these ambulette drivers weekly, in order to bring the patients to their clinic and generate volume. (Tr. 1126-27; see also Tr.

5

119-20, 984, 1167; PSR ¶ 36). As Azimov explained, if the drivers were not paid on time, either the "patients would stop coming to the clinics," or the "drivers then started to transfer them into different clinics . . . ." (Tr. 1153).

A key goal of using the check-cashing stores was to keep the money off the books of the companies that received the funds. The defendant discussed with Roman Azimov how the checks that were cashed would not appear on the payee-companies' bank statements—since they had not been deposited into the companies' bank accounts. Roman Azimov testified that the defendant told him "[t]he checks were to be cashed and they were to be disappeared, they would never exist." (Tr. 1150; PSR ¶ 37). Denis Satyr also understood that they had to go to the check-cashing stores "[s]o it doesn't stand out. These checks get lost at the check-cashing place." (Tr. 152; PSR ¶ 37). Satyr understood one of the purposes of cashing these checks was to "clean the money" and so "you don't have to pay taxes on it." (Tr. 156; PSR ¶ 37). Roman Azimov provided his accountant with just his company's bank statements; he did not tell his accountant about all the money he was receiving from checks that he cashed. (Tr. 1150; PSR ¶ 38). Similarly, in preparing the tax returns for the defendant's companies Advanced Carrier Opportunity and Bee Nurse Employment Solutions, the defendant gave his accountant, Len Adler, the companies' bank statements, or access to those statements; the accountant did not use any source of information other than the information from the bank accounts in determining the companies' income. (Tr. 938-42; PSR ¶ 38).

The defendant and his co-conspirators cashed an enormous amount of money using multiple shell companies between approximately May 2008 and December 2015, as reflected in the government's chart summarizing the voluminous checks cashed by the scheme participants (GX 2006; PSR ¶ 39). The defendant used his own shell companies to cash more than $2.6 million between May 2008 and February 2014. (GX 2025; see also GX 201; PSR ¶ 39).

In addition to the evidence highlighted at trial of the defendant's own check-cashing activity, the defendant and his co-conspirators cashed millions in total:

| **Name** | **Amount of Cashed Checks** | **GX** |
|---|---|---|
| Aleksandr Pikus | $ 2,852,923 | 201 |
| Denis Satyr | $ 1,102,064 | 205 |
| Eugene Sudman | $ 1,247,952 | 206 |
| Malvina Yablonskaya | $ 3,565,671 | 207 |
| Mark Tsyvin | $ 9,406,915 | 202 |

6

| **Name** | **Amount of Cashed Checks** | **GX** |
|---|---|---|
| Moshe Izgelov | $ 2,778,217 | 204 |
| Roman Azimov | $ 6,649,780 | 203 |
| **TOTAL** | **$27,603,525** | |

(PSR ¶ 40). [4]

### C. Defendant's Threats

In order to protect the criminal scheme, the defendant used threats of violence. For example, when a therapist named Max left the Pikus Clinics, the defendant told Oleg Dron "I heard that Max left to another clinic and I'm hearing that he might be trying to take patients from our clinics to that other clinic. . . tell him he better stop unless he likes his legs to be broken." (Tr. 424-25; PSR ¶ 41). The defendant also threatened Oleg Dron. When Dron was in the office at the Brighton 6th Clinic, Dron told the defendant he was thinking about leaving; the defendant responded "you know, you already with us so the only way out is feet first through the door," meaning "like in a body bag." (Tr. 425; PSR ¶ 41).

### D. Prime Care and Bensonhurst

The defendant also assisted in the operations of two clinics owned and managed by co-conspirator Valentina Kovalienko: Prime Care on the Bay ("Prime Care") and Bensonhurst Mega Medical ("Bensonhurst"). (PSR ¶ 42). The medical providers Michael Mak, Oleg Dron, Amgad Mikhail, Michelle Tiflinsky and Miriam Wilensky testified at length about the fraud and kickbacks at these clinics. (PSR ¶ 42). For example, Miriam Wilensky testified how she worked as an occupational therapist at Prime Care until 2011, when it was shut down; at the clinic, she and others overbilled for services that were not provided, billed group therapy as individual therapy, billed for patients as if the licensed professionals personally treated them, and billed for patients when the providers were not even in the office. (Tr. 560-63; PSR ¶ 42). Michael Mak, the medical director of Bensonhurst, explained how he understood everyone got paid: himself, the owner, the therapists, and "[p]atients had to take some home." (Tr. 701; PSR ¶ 42). The therapists Miriam Wilensky and Michelle Tiflinsky explained how undercover videos depicted the kind of group stretches and exercises that were being billed as individual, one-on-one therapy. (Tr. 581-86, GX 1303; Tr. 512-17, GX 1301; PSR ¶ 42). The patients were paid money to attend these therapy sessions and to complain about things that did not actually bother them. (Tr. 605, 609-10; PSR ¶ 42). Ambulette drivers came to Prime Care to collect the cash that would be left in an envelope for them on the front desk. (Tr. 613-14; PSR ¶ 42).

---

[4] The defendant takes specific issue to the inclusion of Moshe Izgelov in these calculations. (See D.E. # 439 at 2 n. 2). Denis Satyr testified that Moshe Izgelov was one of the managers who worked for Mark Tsyvin (Tr. 146), and he was also authorized to cash certain checks for Tsyvin, as Martha Lorenzo testified (Tr. 67).

Michael Mak testified as to how he signed checks from Bensonhurst's bank account at the request of Valentina Kovalienko. (Tr. 706; PSR ¶ 43). But Mak knew that many of these companies were not real vendors, but were there to "get the money off the company account to th[ese] other companies." (Tr. 707; PSR ¶ 43). Moreover, Mak asked Kovalienko to make sure they had documentation to provide to investigators in the event they were ever asked to show that they were paying for legitimate services. (Tr. 709; PSR ¶ 43). Going through various invoices (GX 605), Mak testified how Bensonhurst did not actually receive the services listed in the invoices from National Research Group, Advanced Carrier Opportunity and Bee Nurse Employment Solutions—the defendant's companies. (Tr. 714-24; PSR ¶ 43). And the jury was able to see in evidence checks written to the defendants' companies from Prime Care and Bensonhurst—which checks the defendant personally cashed. (See, e.g., GX 101-A at 36, 42-45; PSR ¶ 43).

E. The Proceeds

The evidence at trial established that these clinics—the Pikus Clinics, Prime Care and Bensonhurst—submitted more than $96 million in claims to Medicare and Medicaid, which paid more than $39 million on those claims. (GX 2008, 2009, 2010, 2011, 2012; PSR ¶ 45).

| Medicare Claims | | | |
|---|---|---|---|
| **Provider Name** | **Date Range** | **Medicare Billed** | **Medicare Paid** |
| Prime Care on the Bay | 2/2008 – 2/2011 | $9,564,143.51 | $3,229,557.95 |
| Bensonhurst Mega Medical | 1/2009 – 2/2011 | $13,121,749.66 | $9,963,469.87 |
| Oleg Dron | 1/2011 – 1/2014 | $7,805,564.01 | $3,457,546.04 |
| Amgad Mikhail | 1/2011 – 3/2016 | $4,840,939.83 | $1,961,959.51 |
| Eduard Noykhovich | 2/2010 – 12/2014 | $11,555,201.57 | $4,632,756.68 |
| **SUBTOTAL** | | **$46,887,598.58** | **$23,245,290.05** |
| Medicaid Claims | | | |
| **Provider Name** | **Date Range** | **Medicaid Billed** | **Medicaid Paid** |
| Prime Care on the Bay | 2/2008 – 2/2011 | $21,905,830.89 | $12,574,506.30 |
| Bensonhurst Mega Medical | 1/2009 – 2/2011 | $10,683,817.28 | $1,823,312.05 |
| Oleg Dron | 1/2011 – 1/2014 | $3,530,282.00 | $373,581.64 |
| Amgad Mikhail | 1/2011 – 3/2016 | $4,665,760.00 | $499,849.96 |
| Eduard Noykhovich | 2/2010 – 12/2014 | $8,627,923.00 | $974,972.30 |
| **SUBTOTAL** | | **$49,413,613.17** | **$16,246,222.25** |
| **TOTAL** | | **$96,301,211.75** | **$39,491,512.30** |

In addition, claims data for co-conspirator providers Abraham Demoz, Wael Bakry, Victor Genkin, Mayura Kanekar and Alexander Khavash shows even further claims that were submitted to and paid by Medicare during the scheme:

| Provider Name | Date Range | Medicare Billed | Medicare Paid |
|---|---|---|---|
| Wael Bakry | 1/2009 – 8/2014 | $39,640,812.53 | $17,315,406.59 |
| Abraham Demoz | 1/2009 - 3/2015 | $16,808,663.50 | $10,545,524.71 |
| Victor Genkin | 1/2009 - 8/2014 | $24,120,023.11 | $11,262,572.37 |
| Mayura Kanekar | 12/2009 - 6/2016 | $35,764,794.04 | $15,591,615.27 |
| Aleksandr Khavash | 1/2009 - 8/2014 | $9,965,769.00 | $4,193,422.32 |
| **TOTAL** | | **$126,300,062.18** | **$58,908,541.26** |

In total, Pikus led a scheme that submitted over $220 million in claims costing the Medicare and Medicaid program nearly $100 million in losses. (PSR ¶ 45):

|  | Total Billed | Total Paid |
|---|---|---|
| Medicare | $173,187,660.76 | $82,153,831.31 |
| Medicaid | $49,413,613.17 | $16,246,222.25 |
| **TOTAL** | $222,601,273.93 | $98,400,053.56 |

II.     The Defendant's Guidelines Range

The Presentence Investigation Report calculated the defendant's Guidelines range at a level 38, as follows:

| | |
|---|---|
| Base Offense Level: 8 plus 22 corresponding to the value of the laundered funds of more than $25 million (§2S1.1(a)(2)) | 30 |
| Plus: Conviction under 18 U.S.C. § 1956 (§2S1.1(b)(2)(B)) | +2 |
| Plus: Sophisticated laundering (§ 2S1.1(b)(3)) | +2 |
| Plus: Aggravating role (§ 3B1.1(a)) | +4 |
| Total: | 38 |

(PSR ¶¶ 57-64).

The resulting Guidelines level of 38 calls for a sentence in the range of 235 to 293 months' imprisonment. The Probation Department has recommended a sentence of 235 months' imprisonment and an order of restitution on Count Five of $238,932, payable to the IRS.

The characteristics of the defendant's offenses weigh heavily in favor of a sentence within the Guidelines range. Defendants found guilty of health care schemes in this District have been sentenced to similar, significant sentences. For example, a defendant in the Bay Medical clinic case, Irina Shelikhova, received a sentence of 15 years of imprisonment in connection with a Medicare fraud involving $77 million billed and $50 million paid. See United States v. Irina Shelikhova, et al., No. 10-CR-771 (NG) (Judgment)

9

(D.E. # 730). One of Shelikhova's co-conspirators, Gustave Drivas, was sentenced to more than 12 years in prison for his role in that scheme. United States v. Irina Shelikhova, et al., No. 10-CR-771 (NG) (Judgment) (D.E. # 679). By contrast to the one led by Pikus, the scheme in the Shelikhova case was shorter (approximately five years in length) and cost taxpayers only about half of the total amounts paid by Medicare and Medicaid to the medical providers who conspired with Pikus. Shelikhova, No. 10-CR-771 (NG) (U.S. sentencing submission) (D.E. # 663). Even Valentina Kovalienko, the defendant's co-conspirator and manager of just two of the scheme clinics (Prime Care and Bensonhurst clinics) received a sentence of seven years of imprisonment for her role in the scheme over a three-year period from approximately February 2008 to February 2011. See United States v. Valentina Kovalienko, 11-CR-106 (RRM) (Judgment) (D.E. # 464).[5]

In terms of its length, breadth and complexity, and the damage it inflicted on vital government health care programs, the scheme led by Pikus far surpasses those committed in these cases. Indeed, the scheme perpetrated by Pikus exceeds any other like it charged in this District in recent memory. The sentenced imposed by this Court should match the severity of these crimes.

\* \* \*

The government anticipates that certain elements of the defendant's Guidelines calculation will be disputed at sentencing, including the loss enhancement, the sophisticated laundering enhancement and the aggravating role enhancement. Each of these will be addressed in further detail below.

### A. Value of the Laundered Funds

The Presentence Investigation Report calculates the "value of the laundered funds" pursuant to §2S1.1(a)(2) as $27,842,457.92. (PSR ¶ 57). This figure is based on the amount of checks that the defendant and his co-conspirators cashed at check-cashing locations, as detailed in the table above. (See also PSR ¶ 40). The evidence at trial showed how the defendant and his co-conspirators cashed checks at the check-cashing locations to launder fraud proceeds. As Roman Azimov testified, the defendant was the one who explained to him how "[t]he checks were to be cashed and they were to be disappeared, they would never exist." (Tr. 1150).

### B. Sophisticated Laundering

An additional two levels are warranted for "sophisticated laundering" under §2S1.1(b)(3). The application note to this section provides that "'sophisticated laundering'

---

[5] In another example, Dr. Syed Ahmed was sentenced to 13 years of imprisonment for his role in perpetrating a fraudulent scheme against the Medicare program which cost the government approximately $7 million. United States v. Syed Imran Ahmed, No. 14-CR-771 (DLI) (Judgment) (D.E. # 238).

10

means complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense. Sophisticated laundering typically involves the use of—(i) fictitious entities; (ii) shell corporations; (iii) two or more levels (i.e., layering) of transactions . . . involving criminally derived funds that were intended to appear legitimate; or (iv) offshore financial accounts." See 2018 Guidelines Manual §2S1.1 Application Note 5. The defendant not only used multiple shell companies himself, but also layered transactions involving multiple shell companies, including transactions between his own shell companies (see, e.g., GX 201 at 20 ($9,500 check from Bee Nurse Employment Solutions to Advanced Carrier Opportunity)). Moreover, the defendant went to great lengths to keep the operations' transactions under the $10,000 reporting thresholds by dividing checks and spreading them around multiple check-locations in Brooklyn, Queens and Manhattan. This activity qualifies as "sophisticated" laundering.

      C.      Aggravating Role

The Presentence Investigation Report also correctly includes an additional 4 levels for the defendant's role as a leader involving more than five participants. See U.S.S.G. §3B1.1(a) ("If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels."). The commentary to Section 3B1.1 provides guidance on whether a defendant is an organizer or leader (warranting a 4-level enhancement) or is merely a "manager or supervisor" (warranting a 3-level enhancement, pursuant to U.S.S.G. §3B1.1(b)):

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

2018 Guidelines Manual § 3B1.1 Application Note 4.

Multiple witnesses testified how the defendant directed the operations of the scheme as an organizer or leader, and not merely as a supervisor or manager. For example, Rubenov testified how if he had issues with Azimov or Sudman not bringing cash for patients on time, Rubenov called the defendant to resolve the issue (Tr. 991-93, 1022-23, 1024-25). Similarly, Dron testified that the other managers would call the defendant with any kind of issues. (Tr. 391). These other participants included, but are not limited to, the following purported clinic managers: Mark Tsyvin, Roman Azimov, Max Vernik, Denis Satyr, Eugene Sudman, and Malvina Yablonskaya. (Tr. 1131-32; see also Tr. 115-19, 398-99, 993-94, 1024), and licensed providers: Oleg Dron, Amgad Mikhail, Eduard Noykhovich, Wael Bakry, Abraham Demoz, Victor Genkin, Mayura Kanekar and Alexander Khavash. (Tr. 1157-62). Azimov and Rubenov testified how the defendant brought them into the

11

scheme and explained how it worked. (Tr. 984, 1113-15). Clearly, the evidence demonstrated that the defendant was a leader of extensive criminal activities involving well more than five participants.

III.      A Sentence of Incarceration within the Advisory Guidelines Range Is Appropriate

      A.      Legal Standard

In United States v. Booker, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but also may tailor the sentence in light of other statutory concerns. 543 U.S. 220, 245 (2005); see 18 U.S.C. § 3553(a). Subsequent to Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). Although the Second Circuit declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall, 552 U.S. at 49 (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the Court] may not presume that the Guidelines range is reasonable. [The Court] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).

      B.      Application of Law

Title 18, United States Code, Section 3553(a), provides numerous factors that the Court must consider in sentencing the defendant. Factors pertinent to the instant offense are discussed below, numbered as they are in Section 3553(a).

      1.      The Nature and Circumstances of the Offenses and the History and Characteristics of the Defendant

The nature and circumstances of the offense—a lengthy criminal scheme that defrauded Medicare and Medicaid of tens of millions—weighs heavily in favor of a substantial sentence. The evidence at trial demonstrated how the defendant was critical to the success of the scheme by taking on an indispensable role that involved expanding the number of persons involved in the scheme, maximizing billing, and directing and assisting in

the laundering the proceeds of the fraud to further the scheme and enrich himself and his co-conspirators.

Nothing about the defendant's history or personal circumstances distinguish him from any other perpetrator of a significant financial crime. Put simply, this was not a crime of need. Nor was it crime resulting from events thrust upon him by outside forces. This was a calculated crime of choice. Instead of making money honestly, the defendant decided to participate in a large scheme to steal from Medicare and Medicaid. The consequences that incarceration will inflict on those around him are the unfortunate result of the choices he has made.

2. The Seriousness of the Offense

Fraud against the Medicare and Medicaid programs is a serious offense that targets a national program relied on by millions of Americans. Congress aptly summarized the effects of health care fraud over thirty-five years ago:

> In whatever form it is found, . . . fraud in these health care financing programs adversely affects all Americans. It cheats taxpayers who must ultimately bear the financial burden of misuse of funds in any government-sponsored program. It diverts from those most in need, the nation's elderly and poor, scarce program dollars that were intended to provide vitally needed quality health services.

H.R. 95-393, pt. II, at 44 (1977); see also H.R. Rep. 104-747 (1996), ("Everyone pays the price for health care fraud: beneficiaries of Government health care insurance such as Medicare and Medicaid pay more for medical services and equipment; consumers of private health insurance pay higher premiums; and taxpayers pay more to cover health care expenditures.").

These concerns are just as pressing today as they were then, which is why Congress has enacted increasingly severe penalties for health care fraud, most recently directing the Sentencing Commission to add enhancements for defendants who commit the most financially serious health care frauds. See Patient Protection and Affordable Care Act, Pub. L. No. 111-148, §10606(a)(2)(C), 124 Stat. 119, 1007 (2010) (directing Sentencing Commission to amend guidelines in order to punish health care fraud more severely).

The defendant swindled the Medicare and Medicaid programs of tens of millions of dollars through the operation of massive kickback scheme. The seriousness of the offense weighs strongly in favor of a substantial sentence.

       3.      <u>The Need to Promote Respect for the Law, Afford Adequate Deterrence, and to Protect the Public from Further Crimes of the Defendant</u>

      The defendant's decision to continue the scheme for years shows a lack of respect for the law; it also shows that he believed that through the clinics he could continue to steal from the Medicare and Medicaid programs without any fear of getting caught. These considerations weigh in favor of a substantial sentence that would convey the seriousness of his decision to steal from government health care programs and hide the proceeds.

      The need for general deterrence also weighs heavily in favor of a lengthy jail term. 18 U.S.C. §§ 3553(a)(2)(B) and (c). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime can therefore be affected and reduced with serious punishment." <u>United States v. Martin</u>, 455 F.3d 1227, 1240 (11th Cir. 2006). Health care fraud is a complicated crime involving difficult questions at the interstices of the medical and legal professions. For these and other reasons, the likelihood of detection is relatively low. <u>See</u> Diane E. Hoffmann, <u>Physicians Who Break the Law</u>, 53 St. Louis U.L.J. 1049, 1052 (2009) (pointing to empirical research showing that professionals believe the probability of getting caught committing a white-collar crime is low and that fraud is "relatively easy to hide and hard to detect" because the acts involved "tend to be made up of complex, sophisticated, and relatively technical actions" that are "intermingled with legitimate behavior") (internal quotations and citations omitted)). As a result, in the circumstances presented by the crime of kickbacks in the Medicare and Medicaid program, effective general deterrence requires strong penalties for those who are caught. This is especially true when the potential rewards for would-be criminals who are not caught can be substantial and when the deceptive steps taken by individuals, like the defendant, makes such fraud extremely difficult to detect and successfully prosecute.

      Moreover, the defendant's misconduct extended beyond the financial crimes themselves. The defendant used violent threats to protect his criminal operations, by, for example, threatening a co-conspirator who was thinking about leaving the scheme by saying: "[Y]ou know, you['re] already with us so the only way out is feet first through the door," meaning "like in a body bag." (Tr. 425; PSR ¶ 41). Such serious, violent threats warrant a serious sentence.

      In sum, the defendant's punishment should take into account not only the scope and seriousness of his criminal conduct, as described herein, but also the need to deter future criminals from stealing from the Medicare and Medicaid programs. Health care fraud is a serious problem nationwide, and especially in New York City.

       4.      <u>The Need to Avoid Unwarranted Sentence Disparities</u>

      In this case, the Court should make its own independent assessment of an appropriate sentence, taking into account the <u>national</u> disparity that would arise were the Court not to impose a significant sentence on a fraudulent health care clinic owner who

14

defrauded Medicare and Medicaid of millions of dollars. United States v. Wills, 476 F.3d 103, 109 (2d Cir. 2007) abrogated on other grounds as recognized by United States v. Cavera, 550, F.3d 180, 191 (2d Cir. 2008). Moreover, the Court should not weigh this factor more heavily than any of the others, including the seriousness of the offense and the need to deter others, whose crimes are difficult to detect and prosecute, from defrauding Medicare and Medicaid. See United States v. Fernandez, 443 F.2d 19, 32 (2d Cir. 2006) ("[E]ven if § 3553(a)(6) were a lawful basis for lenience here, the requirement that a sentencing judge consider an 18 U.S.C. § 3553(a) factor is not synonymous with a requirement that the factor be given determinative or dispositive weight in the particular case, inasmuch as it is only one of several factors that bust be weighted and balanced by the sentencing judge.").

      A sentence within the applicable guidelines range in this case would be consistent with sentences imposed on similarly-situated defendants for the commission of comparable schemes. For example, in United States v. Gibson, a district court in the Southern District of Texas sentenced a defendant to 45 years in prison for his role in a scheme to defraud Medicare through several mental health programs. The defendant was convicted of health care fraud conspiracy, kickback conspiracy, kickbacks, and money laundering conspiracy for a fraud where $160 million in false claims were submitted and $46 million paid on those claims. See United States v. Gibson, 12-CR-600 (S.D. Tex. 2012). In another case, United States v. Moreira, a district court in the Southern District of Florida sentenced the owner of a fraudulent home health agency to 235 months' imprisonment for her role in leading a Medicare fraud scheme involving the payment of kickbacks to patient recruiters, the billing of physical therapy and skilled nursing services that were not medically necessary or not provided, and the laundering of the proceeds of the fraud. See United States v. Moreira, No. 13-CR-20298 (S.D. Fla. 2013).

      The case of United States v. Duran makes plain why sentences of this length are necessary in frauds against federal health care programs, like Medicare and Medicaid. United States v. Duran, No. 10-CR-20767 (S.D. Fla. 2011). There, the defendant received a 50-year term of imprisonment for his role in running a fraudulent mental health program which submitted more than $200 million in false claims to Medicare. In affirming the sentence, the Eleventh Circuit recognized the harms caused by conduct like this:

> The offenses in this case spanned nearly eight years and involved Appellants paying [Assisted Living Facilities] and halfway houses to exploit thousands of seriously impaired individuals for their Medicare benefits. Appellants submitted over $200 million in bogus Medicare claims, received over $87 million in fraudulent payments, and used shell corporations and sham transactions to launder their ill-gotten gains. They did so at the expense of the public fisc and thousands of individuals unable to effectively care for themselves. In our view, crimes such as these stem from greed of the worst variety, and evince a parasitism and disregard for societal norms that are anathema to civil society. It is the very aim of sentencing to exorcise individuals such as these from the public square. . . . These sentences do just that.

United States v. Duran, 620 F. App'x 687, 695-96 (11th Cir. Feb. 25, 2013) (per curiam) (unpublished).

Like in these cases, the losses resulting from Pikus's actions were staggering. Only a commensurate sentence would be appropriate.

IV. Restitution

Under 18 U.S.C. § 3663A, the Court shall impose restitution. In United States v. Zangari, 677 F.3d 86, 93 (2d Cir. 2012), the Second Circuit held that restitution must be measured according to the victim's actual loss, not the defendant's gain. Moreover, in calculating restitution, "these losses need not be mathematically precise," and "[a] reasonable approximation will suffice, especially in cases in which an exact dollar amount is inherently incalculable." United States v. Rivernider, 828 F.3d 91, 115 (2d Cir. 2016) (internal quotation marks omitted).

Here, the defendant participated in a wide-ranging scheme where patients attended clinics where, among other things, services were provided by unlicensed aides, group therapy was performed instead of individual therapy, and the purported services were provided in exchange for bribes and kickbacks. All of this was done to generate claims that Medicare and Medicaid would not reimburse. As set forth above (see Section I.E), the actual loss to these health care programs was $82,153,831.31 for Medicare and $16,246,222.25 for Medicaid.

In addition, as part of the scheme to obstruct the lawful functions of the IRS, the defendant omitted the checks his shell companies cashed from the tax return forms, thereby improperly reducing their taxable income and his personal, taxable income. Therefore restitution to the IRS in the amount of the tax loss[6] is appropriate as set out below:

| **Year** | **Form** | **Individual / Corp.** | **Unreported Income** | **Estimated Tax Loss** |
|---|---|---|---|---|
| 2008 | 1120 | Advanced Carrier Opportunity LLC | $146,905 | $49,947.70 |

---

[6] A reasonable approximation of the tax loss is 34% of the under-reported gross income of a corporate taxpayer (who files on the Form 1120) and 28% of the under-reported gross income of an individual taxpayer (who files on the Form 1040), as this is the same method used to calculate tax loss in determining the Guidelines range for offenses involving tax evasion and fraudulent and false tax returns. See 2018 Guidelines Manual § 2T1.1(c)(1)(A) ("If the offense involved filing a tax return in which gross income was underreported, the tax loss shall be treated as equal to 28% of the unreported gross income (34% if the taxpayer is a corporation) plus 100% of any false credits claimed against tax, unless a more accurate determination of the tax loss can be made.").

| Year | Form | Individual / Corp. | Unreported Income | Estimated Tax Loss |
|---|---|---|---|---|
| 2009 | 1120 | Advanced Carrier Opportunity LLC | $710,545 | $241,585.30 |
| 2009 | 1120 | Bee Nurse Employment Solutions Inc. | $33,670 | $11,447.80 |
| 2010 | 1040 | Aleksandr Pikus | $291,083 | $84,673.00 |
| 2011 | 1040 | Aleksandr Pikus | $138,087 | $38,664.36 |
| 2012 | 1040 | Aleksandr Pikus | $36,245 | $10,148.60 |
| **TOTAL** | | | | **$433,297.00** |

V.   Conclusion

For the foregoing reasons, and based on a balancing of the § 3553(a) factors, the Court should impose a sentence with the Guidelines range described herein—235 to 293 months of imprisonment—as well as order the defendant to pay restitution in the amounts of $82,153,831.31 to Medicare, $16,246,222.25 to Medicaid and $433,297.00 to the IRS and a forfeiture money judgment in the amount of $2,614,233.79.

Very truly yours,

ROBERT ZINK
Chief
Criminal Division, Fraud Section
U.S. Department of Justice

By:      /s/   
A. Brendan Stewart
Assistant Chief
Sarah Wilson Rocha
Andrew Estes
Trial Attorneys
Criminal Division, Fraud Section
U.S. Department of Justice
(718) 254-6250