# EXHIBIT A

# United States Court of Appeals
# for the Second Circuit

August Term, 2021

(Argued: January 27, 2022     Decided: June 30, 2022)

Docket No. 20-3080-cr

───────────────────────────

UNITED STATES OF AMERICA,

*Appellee,*

v.

ALEKSANDR PIKUS,

*Defendant-Appellant,*

MARK TSYVIN, MAKSIM VERNIK, DENIS SATYR,
MALVINA YABLONSKAYA,

*Defendants.*[*]

───────────────────────────

Before:

PARK and ROBINSON, *Circuit Judges*, and RAKOFF, *District Judge*.[†]

After a three-and-a-half-year delay, a jury convicted Defendant-Appellant Aleksandr Pikus of conspiring to launder the proceeds generated by a network of Brooklyn medical clinics that were alleged to be systematically defrauding the

───────────────────

[*] The Clerk of Court is respectfully directed to amend the caption as set forth above.

[†] Judge Jed S. Rakoff of the United States District Court for the Southern District of New York, sitting by designation.

CERTIFIED COPY ISSUED ON 06/30/2022

federal health insurance programs Medicare and Medicaid. Pikus appeals his conviction and sentence. He argues that the district court erred when it denied his motions to dismiss based on violations of the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* Specifically, Pikus claims that the district court improperly excluded time based on the complexity of the case without determining, on the record, why the case was complex or that such exclusions outweighed the best interest of the public and the defendant in a speedy trial. He contends that the excessive pre-trial delay, to which he objected, arose not from the supposed complexity of the prosecution but rather because the Government delayed production of certain documents possessed by state and federal agencies that had participated in the joint investigation and prosecution of Pikus.

We agree with Pikus that the factual findings supporting the district court's exclusion of time during at least two long periods of delay were insufficient under the Speedy Trial Act, and in some cases clearly erroneous. As a result, Pikus's trial commenced after the Speedy Trial Act's 70-day clock had expired. We therefore **REVERSE** the judgment of conviction, **VACATE** the appellant's conviction and sentence, and **REMAND** to the district court for further proceedings consistent with this opinion.

AARON M. RUBIN, New York, NY, *for Defendant-Appellant.*

WILLIAM A. GLASER, Attorney, Appellate Section Criminal Division (A. Brendan Stewart, Andrew Estes, and Sarah Wilson Rocha, Attorneys, Fraud Section Criminal Division; Daniel S. Kahn, Acting Deputy Assistant Attorney General, *on the brief*), *for* Nicholas L. McQuaid, Acting Assistant Attorney General, Washington D.C., *for Appellee.*

RAKOFF, *District Judge*:

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." U.S. CONST. amend. VI. To enforce this mandate, the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.*, provides that a criminal case shall be brought to trial within 70 days, subject to limited exclusions.

Yet here, despite the defendant's repeated requests for a speedy trial, this case took more than three years to get to jury selection. This was primarily the result of the Government's delay in producing discovery and the district court's failure to effectively respond.

Defendant-appellant Aleksandr Pikus was one of several people investigated, arrested, and prosecuted by the Brooklyn component of the Medicare Fraud Strike Force, a collaboration of federal prosecutors with state and federal agencies responsible for ferreting out fraud and abuse of government health insurance programs.[1] Throughout a lengthy discovery process that spanned several years, the Government sporadically and haphazardly produced various audit documents requested by Pikus (and ultimately subpoenaed by the district

---

[1] *See* Dep't of Justice Fraud Section, *Brooklyn Strike Force Operations*, (Mar. 29, 2021), https://www.justice.gov/criminal-fraud/brooklyn-strike-force-operations.

court). Through this time, the district court neither held the Government accountable nor appropriately considered whether "the ends of justice served by . . . granting [the resulting] continuance[s] outweigh[ed] the best interests of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7)(A).[2]

Although the mandate of the Speedy Trial Act ("the Act") operates even if a defendant purports to waive its application, *Zedner v. United States*, 547 U.S. 489, 502–03 (2006), here Pikus twice moved for dismissal of the indictment on speedy trial grounds before being convicted on all counts. Those motions to dismiss should have been granted. The delay in this case was extraordinary, and we conclude that there were at least two distinct periods of delay in which the district court's exclusions of time were based on insufficient or clearly erroneous factual findings. Each of the two resulting periods of non-excludable time exceeded the 70-day maximum set forth in the Act, and dismissal is the mandatory sanction for violation of this limit. Therefore, for the reasons set forth below, we reverse the district court's denial of Pikus's motions to dismiss and remand the case with

---

[2] Unless otherwise specified, all internal quotation marks, elisions, alterations, emphasis, and citations are omitted from all sources cited herein.

instructions to vacate Pikus's conviction and to determine whether the pending charges should be dismissed with or without prejudice.

## I. BACKGROUND

### A. The Money Laundering Conspiracy

After a six-day trial, Pikus was convicted by a jury of conspiring to launder the proceeds generated by a network of Brooklyn medical clinics that were alleged to be systematically defrauding the government-funded health insurance programs Medicare and Medicaid. Although Pikus was a former chiropractor, he did not work as a medical provider or bill Medicare or Medicaid on his own behalf. Rather, Pikus held himself out as the operator of companies that handled insurance claims and provided other ancillary support services for chiropractors, physical therapists, occupational therapists, and other medical professionals (collectively, the "providers"). The indictment, filed on June 17, 2016, alleged that Pikus had enabled these providers to defraud Medicare and Medicaid. The underlying fraudulent practices included overbilling, group therapy billed as individual therapy, and billings for patients not personally treated by the providers. To effectuate the scheme, the providers gave cash to ambulette drivers—individuals providing patient transport—who in turn paid illegal

kickbacks to Medicare- and Medicaid-qualifying patients to attend appointments at the clinics. While the scheme initially focused on elderly, Russian-speaking patients in Brooklyn, when that patient population had been largely exhausted, the ambulette drivers began soliciting people from nearby homeless shelters.

Pikus became involved in this scheme in 2008, when he started providing billing services—and, according to the Government, laundering money—for two Brooklyn medical clinics owned and managed by Valentina Kovalienko. The evidence showed that Pikus's role in the conspiracy was to launder Medicaid and Medicare reimbursements into cash, and then to deliver that cash to Kovalienko at her clinics. To conduct this laundering, Pikus operated eight shell companies purporting to provide various services such as "advertising" and "marketing." App'x at 1573. The providers at Kovalienko's clinics would write checks to the companies drawn on accounts funded by their Medicare and Medicaid reimbursements.[3] The shell companies would produce fake invoices purporting to

---

[3] Pikus's co-conspirators owned other shell companies in their own names and their family members' names, because Pikus told them at a meeting that they were "too exposed with [their] corporations" and "needed to diversify" with different "names" and "Social Security numbers." App'x at 2069-70. One of these co-conspirators testified that these companies' purpose was "to receive the monies from the doctors" and "maneuver the money into . . . various check cashing stores." App'x at 2070-71.

justify the transactions by describing fake business expenses, "[i]n case the business gets audited by tax authorities or Medicare." App'x at 1672–73. Pikus and his co-conspirators would then travel to various check cashing stores throughout New York City and convert the checks to cash in a manner structured to avoid triggering federal reporting requirements. Ultimately, Pikus and his co-conspirators laundered more than $1.8 million in reimbursements associated with Kovalienko's clinics into cash. Kovalienko was eventually arrested in February 2011, and her two clinics were shut down shortly thereafter.

The indictment further alleged that Pikus expanded his role in the conspiracy even before Kovalienko was arrested.[4] Since at least 2010, Pikus managed clinics on Surf Avenue, Neptune Avenue, East 15th Street, Brighton 4th Street, and Brighton 6th Street in Brooklyn. Pikus held himself out as the billing agent for providers operating at these facilities, but he also supplied medical providers with office space and money laundering services in exchange for an 80-90% cut of their Medicare and Medicaid billings. Some of these providers were

---

[4] Pikus argues on appeal that the Government improperly conflated into a single conspiracy Pikus's conduct associated with Kovalienko's clinics with his conduct after her arrest. We do not reach this issue, and our description of the factual allegations does not reflect any view on its merits.

7

people who had worked with Kovalienko but had grown frustrated with her, and other providers joined Pikus's clinics after Kovalienko was arrested and her clinics shut down. At trial, several of these providers testified about working with Pikus, paying fees to his management companies that "were just way too high" to be "regular business expenses," App'x at 1364, and testified that they were fraudulently billing Medicare and Medicaid. The money laundering transactions allegedly proceeded largely as they had when Pikus was working with the Kovalienko clinics, with members of the conspiracy visiting check cashing stores throughout New York City with checks written to the shell companies. The Government argued at sentencing that Pikus and his co-conspirators cashed checks written to the shell companies totaling more than $25.6 million.

B. Pre-Trial Proceedings

Pikus was arrested on June 20, 2016, and he was presented and arraigned before a magistrate judge in the Eastern District of New York that same day. The indictment unsealed on the day of his arrest charged Pikus and others with seven counts of money laundering under 18 U.S.C. § 1956(a)(1)(B)(i); money laundering conspiracy, under 18 U.S.C. § 1956(h); conspiracy to pay and receive health care kickbacks, under 18 U.S.C. § 371; and conspiracy to obstruct the Internal Revenue

Service, under 18 U.S.C. § 371. The magistrate judge released Pikus on bond, and then granted the Government's motion to exclude time, calling the case "complex" and finding "that it would be in the interest of justice to exclude" time until June 29, 2016. App'x at 88. Subsequently, the district court conducted a status conference on June 29, 2016, where the Government stated that it planned to "make discovery productions beginning immediately and then several more in the coming weeks." App'x at 95. The court excluded time without objection until September 30, 2016, stating only "[c]omplex case and also for negotiations" and without making any ends-of-justice finding. App'x at 98.

### 1. *Initial Discovery Request*

Pikus's defense to the money laundering charges centered on seeking to negate the required *mens rea* element of section 1956(a)(1)(B)(i). With respect to the defendant's state of mind, the "concealment" prong of the money laundering statute requires the Government to prove both that the defendant knew that he was conducting financial transactions "designed . . . to conceal or disguise the nature, the location, the source, the ownership, or the control" of the funds in which he was dealing and that the defendant knew that "he [wa]s dealing with the proceeds of 'some' crime even if he d[id] not know precisely which crime."

9

*United States v. Maher*, 108 F.3d 1513, 1525–26 (2d Cir. 1997). Pikus argued that he reasonably believed that the funds he received from the providers were the proceeds of legitimate medical insurance claims (regardless of whether the procedures actually were legitimate or not), because he had witnessed many of the medical providers undergo and withstand audits of their billing practices by state and federal regulators. Regardless of whether the audits approved or disapproved the providers' claims (something which Pikus did not know), the fact that the providers survived intensive audits and were still allowed to operate as Medicare and Medicaid billers led Pikus to believe, he claimed, that the providers were delivering legitimate services and obtaining legitimate monies, which he could then process without offending the money laundering statute.

To make out this "good faith" defense, Pikus sought, from the outset, documents pertaining to such audits conducted by the U.S. Department of Health and Human Services ("HHS") via its component, the Center for Medicare and Medicaid Services ("CMS"), the New York State Department of Health ("DOH"), and third-party contractors such as SafeGuard Services LLC ("SGS") and National Government Services ("NGS") that conduct audits on CMS's and DOH's behalf pursuant to the Medicaid Integrity Program. Pikus's first specific request for these

materials that appears in the record was made in a November 30, 2016 letter to the Court requesting the issuance of Rule 17 subpoenas to obtain the audit documents. That letter noted that the Government had made four productions of discovery materials over the prior summer, but that none contained the audit materials. Pikus argued that these audit materials reflected reviews of patient and billing records that the auditors used to determine the medical necessity of treatments submitted to Medicare and Medicaid; interviews with providers, office staff, ambulette services, and patients about potential kickbacks and treatments; and investigation into the validity of payments made from CMS to the providers.

At a status conference held on December 1, 2016, the Government represented to the district court that it had, "for the most part, finished discovery." App'x at 113. But even though the Government did not oppose Pikus's application for the Court's issuance of the Rule 17 subpoenas, the Court refused to issue them. In explaining this refusal, the Court, in apparent understanding of Pikus's good faith defense, stated that "the letter appears to be asking for . . . *Brady* material, and you don't need a subpoena for *Brady* material." App'x at 115. The Court also appeared to understand that the requested documents were effectively in the possession of the Government, for the Court noted that the audit documents were

11

created under the auspices of HHS and, in response to a comment from counsel about which documents were "in the possession of the government," the Court stated, "HHS is part of the government." App'x at 115–18. At the same time, the Court stated that to the extent the letter called for documents other than what the Government deemed to be exculpatory, "the letter basically is a fishing expedition" because defense counsel—who, the Court emphasized, had not seen the documents in question—could not identify specific documents in the audit materials that were favorable. App'x at 115–16. The Court closed the conference by stating "[t]ime is excluded. Motions are pending and negotiations." App'x at 119–20. In fact, however, no motions were pending at the time, because the Court had denied Pikus's request for so-ordered subpoenas and had directed the Government to supply any *Brady* material.

After the hearing, the Government filed a letter response, as the Court had also requested, in which it agreed to confer with the defense and obtain, through "either a subpoena or formal inter-agency request," an agreed-upon subset of the audit documents. App'x at 121–22. However, the Government refused to concede that the audit materials held by CMS, DOH, and their contractors were "within the possession of the prosecution team as a general matter." App'x at 122. By

December 23, 2016, the Government and defense counsel had memorialized in email correspondence a consensual discovery protocol, which called for production of audit materials from CMS, the HHS Office of the Inspector General's ("HHS-OIG") Office of Audit Services ("HHS-OAS"), DOH, SGS, and NGS, covering the same time period as the indictment (2008-2016), and concerning 34 named medical providers.

At a January 4, 2017 conference, the Government reported that it had sent inter-agency requests to HHS and "other entities" but had not yet heard back. App'x at 131. The matter was adjourned for two months, and the Court made a cursory exclusion of time on the Government's motion.

The Government began to produce audit documents to the defense a few days before the March 2, 2017 conference. At the conference, the Government reported that it had produced some materials and argued that the documents were not exculpatory because the audits generally found invalid charges (though Pikus's good faith defense relied on the fact that, despite intensive audits, the providers were allowed to continue billing); but the Government nonetheless committed to continue producing these materials pursuant to its agreement with the defense.

13

At the conference, the Government also reasserted its position that the documents were not *Brady* material, because they were in the possession of other agencies. Nonetheless, the Court continued to treat documents in the possession of HHS and other agencies as potential *Brady* material and subject to disclosure if their content was exculpatory. The Court therefore once again denied Pikus's request to issue Rule 17 subpoenas and told counsel "Are you familiar with Rule 16? Use it, if you have to." App'x at 148. The Government asked the Court for 60 days in which it predicted it would be able to make "significant progress" on the disclosures. App'x at 144. The Court adjourned the case accordingly, stating only "[t]ime will be excluded" without making any more specific finding. App'x at 148.

2.    *Subpoenas to State Agencies and First Speedy Trial Act Motion*

At the next conference, on May 3, 2017, the Government stated it was "finished collecting this material" with respect to the audit information it had promised to produce. App'x at 158. It then advised that the defense would have to subpoena two New York State agencies—the New York State Office of the Medicaid Inspector General ("OMIG") and the New York State Attorney General's Medicaid Fraud Control Unit ("MFCU")—because they were refusing to produce documents in response to the Government's requests. The defense contested the

14

Government's representation that production of the audit materials was complete and requested that the Court direct HHS to certify the completeness of its production. But the Court refused, accepting the prosecutor's representation that HHS had produced all responsive materials.[5]

Defense counsel also argued that it was improper for the Government to have waited to disclose that subpoenas would be needed to obtain documents from the state agencies involved in the joint investigation of Pikus. At that point, the Court agreed to issue defense subpoenas to the two state agencies, even though, five months earlier, it had declined to issue such subpoenas on the ground that *Brady* and Rule 16 made subpoenas unnecessary. At the conclusion of the conference, the Court stated without explanation or a motion, "Time is excluded." App'x at 166. The case was adjourned to June 6.

Pikus formally moved for the subpoenas' issuance by letter motion dated May 23, 2017, and the Court issued them after the June 6, 2017 status conference. Again, Government counsel did not request any exclusion of time, and the Court

---

[5] The Court stated: "I am going to go by what the prosecutor said. He says he has given it to you, he has given it to you. If he has not given it to you, there are consequences for it." App'x at 160-61.

stated only "Time is excluded" without making any associated findings. App'x at 179. The case was then adjourned to September.

On July 5, 2017, the same prosecution team filed a separate indictment of five providers for whom Pikus had provided billing services (the "*Bakry* case"). The Government filed a related cases letter on July 31, 2017, and the *Bakry* case was reassigned to the same district judge presiding over the *Pikus* case, although they were not consolidated.

On September 12, 2017, the Court held another status conference at which the Government committed to produce to Pikus certain relevant discovery from the *Bakry* case. The defense also informed the Court that responses to the OMIG and MFCU subpoenas were expected on September 26, 2017. At the conclusion of the conference, the Court stated, "Time is excluded," and then remarked, "[y]our motions are still pending and negotiations." App'x at 207. But, in fact, no motions were pending, and there is nothing in the record reflecting any ongoing negotiations involving Pikus. The case was adjourned to October 12, 2017.

At the October 12, 2017 conference, the defense informed the Court that both of the state agencies, OMIG and MCFU, had refused to comply with the so-ordered subpoenas, even though they were not "just random agencies, these agencies were

16

involved in investigating the claims in this case." App'x at 212. The Government also indicated it anticipated producing at least another 3 terabytes of additional discovery to the defense within the next 45 days. Nonetheless, the Government represented to the Court that it had produced all *Brady* and Rule 16 material and repeated its position that the "material . . . the defendant is seeking from state agencies pursuant to trial subpoenas . . . [is not] in the possession of the trial team, the prosecution team, and we don't believe that it's discoverable." App'x at 211.

Furthermore, the Government maintained its position that documents held not just by cooperating state agencies but also by cooperating federal agencies were not *Brady* material if not in the possession of the prosecutors. The district court once again registered its disagreement, stating "If the Government has a *Brady* obligation, they will comply with that. I'm talking about the Attorney General's Office or any other third party," App'x at 213, and that "if they don't comply with [their *Brady* obligations], there are consequences." App'x at 214. However, the Court did not clearly rule whether the OMIG and MCFU documents were covered by *Brady* and Rule 16, and it took no action to compel production.

At the October 12, 2017 conference, the Court also set pre-trial motion deadlines, over defense counsel's objections that the schedule would make it

17

impossible for him to first obtain and analyze the Government's additional

discovery and any material belatedly produced by OMIG and MCFU. The Court

set a trial date of May 15, 2018 and closed the conference by excluding time stating:

"Time is going to be excluded. The motions are pending. You're in negotiations."

App'x at 222. Neither assertion was accurate, and Pikus's counsel expressly

"object[ed] to the basis of excluding the time." *Id*. Defense counsel explained that

the cause for the delay was neither motions nor negotiations: "the delay in this

case has been on the Government. And that's been clear. They have not produced

the documents that they were supposed to produce. They haven't produced the

documents under Rule 16. They haven't produced *Brady* material. And now they

haven't responded to the subpoenas." App'x at 221.

On October 24, 2017, the Government produced additional documents

related to the *Bakry* case and other materials, including audit documents from

HHS and its contractors. On November 14, 2017, Pikus filed a motion to dismiss

the indictment for violation of the Speedy Trial Act, as well as for dismissal as a

sanction for the Government's refusal to produce purported *Brady* materials from other agencies involved in the investigation.[6]

On February 12, 2018, the district court issued a memorandum order denying Pikus's motion to dismiss. On the *Brady* issue, the Court accepted the Government's representation that it had disclosed all known *Brady* material, though it did not clarify whether *Brady* and Rule 16 required the Government to disclose exculpatory material in the possession of HHS, OMIG, MFCU, and the other entities. With respect to the Speedy Trial Act, the court held that all time had been properly excluded because it had "designated this case complex" at the outset, a designation to which "[n]o parties objected," and then "[a]t each subsequent status conference . . . continued to exclude time based on the complexity of the case, pending motions and ongoing negotiations, without objection from any party." App'x at 347. As the above account demonstrates, the district court's exclusions of time throughout this protracted process were frequently perfunctory, and often based on the court's erroneous determination

---

[6] While that motion was pending, the Court directed the parties to file a joint status report regarding the status of various docket entries related to events that had been disposed of but left open on ECF. The day after that status report was filed, February 1, 2018, the Court entered two orders administratively clarifying the docket consistent with the joint letter.

that motions were pending and negotiations were ongoing. App'x at 98, 119–20, 207.

### 3.    _HHS Subpoena_

On April 18, 2018, less than one month before the supposed trial date, the Government filed a letter styled as a response to a prior procedural order directing the parties to submit proposed jury instructions and _voir dire_ questions. The letter informed the Court of several guilty pleas of co-defendants taken by a magistrate judge in November and December 2017 and gave trial time estimates. But the final paragraph of the letter made a key disclosure: that HHS would be responding to a Rule 17 subpoena issued by one of the _Bakry_ defendants and it could result in additional discovery disclosures to Pikus and his co-defendants "close in time to, during, or even after the trial set to start on May 15." App'x at 386.[7] The Government, which had just successfully litigated the prior Speedy Trial Act motion, sought no adjournment but stated that it merely "wanted to make sure the Court and parties were aware of [these matters]." _Id._

---

[7] The _Bakry_ defendant who issued this Rule 17 subpoena to HHS seeking audit documents was Mayura Kanekar, a provider who had used Pikus as her billing agent. The documents Kanekar sought were a subset of those Pikus had requested but asserted he had not received.

Following the Government's April 18, 2018 letter concerning Pikus, the Court set a conference for April 24, which was adjourned twice, ultimately to May 8. The May 15 trial date remained intact during this time. On May 4, 2018, Pikus requested a trial subpoena for audit files related to Kanekar and "the other medical providers that the Government agreed to produce but never did."[8] App'x at 393. The request also sought an HHS representative to certify the production. The Government opposed Pikus's motion, portraying the requested subpoena as broader than the agreed-to production scope from 2016. In response, the Court directed a representative of HHS to appear on May 10, since the prosecutors stated that they did not represent HHS.

On May 10, the HHS representative acknowledged that the agency possessed responsive, unproduced documents on "investigations" into 13 of the allegedly fraudulent providers for whom Pikus had performed billing services, including "substantial files" on some. App'x at 470–71. The Court ordered HHS to disclose audit files related to Pikus, but HHS had never audited Pikus because he was not a provider. The Government nevertheless agreed that "we do think a

---

[8] Pikus's motion reiterated its position that the HHS audit materials were *Brady* material in addition to Rule 16 discovery." App'x at 393.

broader scope is appropriate" to include "a number of coconspirators, other medical providers," but the Government reasserted that the files were not covered by Rule 16 because "they are not in the possession of the trial team." App'x 472–73. The Government also conceded that the trial would have to be adjourned because the HHS production would take about a month, so the Court set an October 1, 2018 trial date. The Court also excluded time until October 1 on the Government's motion, stating: "I designated it as . . . complex anyway, and this motion is pending, time will be excluded." App'x at 478–79. Pikus's counsel objected, arguing that it was not the case's supposed complexity but the Government's discovery conduct that had delayed the trial.

The Court then left Pikus's proposed subpoena for HHS documents, filed on May 4, 2018, unsigned for 32 days. On May 29, 2018, the Government filed a letter reminding the Court of the outstanding subpoena, which was eventually issued on June 11, 2018.

In negotiations over the subpoena, HHS did not commit to a production schedule, citing problems with its contractors. On August 26, 2018, no HHS production had yet been made, and the defense wrote the court requesting "a hearing to determine, (i) the date on which HHS will produce the audit

documents, (ii) the description and location of the materials (agencies and contractors at issue) (iii) the reason for the delay, and (iv) whether HHS and its agencies and contractors took the necessary steps to preserve the documents." App'x at 523. The Government did not respond. The Court held a status conference on September 6, 2018, at which the HHS representative estimated it would take four to six more weeks to make a production, but the Court rejected this timeline. The Government requested and received an adjournment of the trial to January 28, 2019, and the Court set a status conference for October. The Court also denied Pikus's request for a hearing to determine the cause of HHS's delay and granted the Government's motion to exclude time. When Pikus's counsel argued that the delay arose from the Government's failure to produce documents and articulated the prejudice that had accrued to his client, the Court disagreed, saying "[i]t is a complex case." App'x at 530.

HHS was not represented at the October 24, 2018 conference, leading the parties to dispute whether the HHS production was complete. Defense counsel cited HHS's characterization of its one production since September as an "interim production," but the prosecutor represented the HHS production as complete.

App'x at 535. The Court accepted the Government's representation (over the defense's objection), set a motion schedule, and left the trial date unchanged.

Two days later, the Government filed a letter stating that notwithstanding its representation two days earlier, it was now informed by HHS that the production was not complete, and additional, unspecified material would be produced "in the next few weeks." App'x at 543.

The next conference occurred on November 27, 2018. The prosecutor represented that the HHS production was now complete, and the Court again accepted that representation. (Despite its earlier suggestion that an HHS representative appear at such conferences, none was present.). The Court refused to shift the defense motion date, even though the Government acknowledged that "[r]ight now defense motions are due just a few days from now, December 3rd, that date no longer seems workable." App'x at 546.

On December 10, 2018, Pikus filed a letter with the Court requesting sanctions against the Government for failure to produce the audit documents Pikus had been requesting for over two years as central to his good faith defense. The Government responded that it did not intend to use the audit materials in its case in chief, and it disputed the scope of the defense subpoena as it related to

audits of the *Bakry* defendants.[9] The Court denied Pikus's motion for sanctions on January 15, 2019. The Court provided no reasoning other than that it "finds that a sanction is not appropriate in this instance, however, the Government is forbidden from using any information derived from the audits in their case-in-chief." App'x at 587. This was, of course, no sanction, since the Government was not planning to rely on the audit materials; the defense was.

On January 18, 2019, the Government filed a motion *in limine* to exclude such audit documents as had been produced. The Government's motion relied on two district court cases involving prosecutions of doctors for healthcare fraud.[10] The Government also informed the Court that the special agent that the Court had allowed the defense to call as a witness was on maternity leave and would be

---

[9] The Government suggested in its response that the *Bakry* defendants' "work as medical providers . . . is not expected to be part of the trial." App'x at 570. Ultimately, however, the Government did rely on evidence about the *Bakry* defendants, and a majority of the total laundered funds alleged at sentencing related to Pikus's business with the *Bakry* defendants, who had not been convicted of healthcare fraud. After we heard oral argument on this appeal, the remaining three *Bakry* defendants, including Mayura Kanekar, were tried on healthcare fraud, money laundering, and tax fraud charges, and a jury acquitted them on all counts. *See United States v. Bakry*, No. 1:17-cr-353 (ERK), ECF 374 (E.D.N.Y. June 13, 2022).

[10] *See United States v. Ahmed*, No. 14-CR-277 (DLI), 2016 WL 8732355, at *1 (E.D.N.Y. June 24, 2016); *United States v. Nekritin*, No. 10–CR–491 (S–2)(KAM), 2011 WL 2462744 (E.D.N.Y. June 17, 2011).

unavailable until the end of February. As a result, Pikus had no alternative but to move to adjourn the trial. On January 22, 2019, the Court granted that motion, adjourned the trial without specifying a new date, and said "time is excluded." App'x at 658.

On March 13, 2019, the Government filed a letter requesting a trial date. The district court then called for a status conference to take place before a magistrate judge, who described the case as "complex" upon adjourning, after making a specific ends of justice finding—the first of its kind in more than two and a half years. App'x at 665–68.

On April 16, 2019, the parties appeared at the next status conference. The defense noted that additional audit documents had since been produced by HHS. The matter was then scheduled for trial, with jury selection to begin September 9, 2019, *i.e.*, more than 38 months since Pikus's arrest.

C. The Trial

In August 2019, the defense made three pertinent pre-trial motions, including one seeking sanctions based on allegedly undisclosed *Brady* material on the Kovalienko clinics and another seeking to exclude evidence related to certain providers for whom audit materials were never produced. The Government

opposed all three motions. But hours after the defense motion on Kovalienko was filed on August 26, 2019, the Government emailed the defense a 21-page disclosure containing statements made by Kovalienko about another suspect who laundered money for her clinics. This information was previously unknown to the defense but was known to the Government for several years and never produced, even though the case had twice before been days away from trial.

Also, between August 23–29, 2019, the Government "produced over 7 Gigabytes of materials, generally described as '[i]nterview reports,' 'undercover operations,' 'miscellaneous case reports' and 'related case materials.'" App'x at 854. The Government did not explain why these documents were previously withheld, although it later argued these documents were § 3500 and *Giglio* material. The defense again requested dismissal and sanctions for *Brady* violations.

A conference occurred on September 3, 2019. Following a colloquy, the Court denied the pending defense motions regarding the asserted *Brady* material and sanctions. The Court reserved judgment on the Government's motion *in limine*, pending since January, to exclude the audit materials. The Court also stated that it did not view the Kovalienko disclosure as *Brady* material.

On September 8, 2019, the day before jury selection was to begin, Pikus filed a motion to adjourn for further investigation in light of the new disclosures. Defense counsel also rescinded consent to jury selection by a magistrate and requested another continuance. In response, the Court set the trial for the following week and remanded Pikus. Pikus filed a petition for mandamus with this court to reverse the district court's revocation of his bail. We stayed the trial and vacated the revocation order ten days later. The district court then set a new trial date of October 28, 2019, but it failed to exclude time.

Then, on October 25, 2019, three days before trial, the case was reassigned to a different district judge. The evening that the case was reassigned, the newly assigned judge issued a text-only order on the docket, granting the still-pending Government motion *in limine* to exclude the audit materials.

On October 26, 2019, Pikus moved for a 6-week continuance, arguing that counsel was not prepared for trial because of the recent disclosures. The district court denied the motion in part, selecting a jury as scheduled but giving Pikus another week to prepare. Defense counsel then orally renewed his motion to dismiss for Speedy Trial Act violations before jury selection, and the Court denied

it on the record because the case was "designated a complex case," and the defense had itself asked for continuances at various times. App'x at 948.

Following a six-day trial, a jury convicted Pikus of all counts. The district court subsequently sentenced Pikus to 156 months' imprisonment and two years' supervised release.

Pikus then appealed, primarily on the ground of the failure of the district court to grant his repeated motions made under the Speedy Trial Act.[11]

## II.   DISCUSSION

A. <u>The Speedy Trial Act</u>

The Speedy Trial Act requires that a federal criminal trial "shall commence within seventy days" after a defendant who has pled not guilty is charged, the charging document is unsealed, or the defendant makes an initial appearance. 18 U.S.C. § 3161(c)(1). As the Supreme Court has stated, this provision is "unequivocal." *Zedner*, 547 U.S. at 507. "When a trial is not commenced within the

---

[11] On appeal, Pikus also challenges the district court's decisions excluding the audit materials and allowing the trial to proceed without testimony from the *Bakry* defendants; the sufficiency of the evidence supporting the money laundering charges against Pikus; the Government's introduction of evidence regarding what Pikus deemed to be a distinct and time-barred conspiracy involving Kovalienko; and the district court's loss amount calculation.

prescribed period of time, 'the information or indictment *shall be dismissed* on motion of the defendant.'" *Id.* at 508 (quoting 18 U.S.C. § 3162(a)(2)). Moreover, "the public has as great an interest in a prompt criminal trial as has the defendant," thus the Speedy Trial Act requires dismissal even where the parties have consented to adjournments other than those expressly allowed in the Act. *United States v. Gambino*, 59 F.3d 353, 360 (2d Cir. 1995); *see also Zedner*, 547 U.S. at 502–03.

In this regard, the Act provides a detailed scheme through which periods of delay attributable to specified reasons are excluded from the 70-day calculation. *See* 18 U.S.C. § 3161(h). Some enumerated sources of delay are automatically excluded: for instance, "delay resulting from any pretrial motion," *id.* § 3161(h)(1)(D), or "delay resulting from the absence or unavailability of the defendant or an essential witness," *id.* § 3161(h)(3)(A).

In addition, however, to provide some "flexibility," *Zedner*, 547 U.S. at 498, the Act also provides, in 18 U.S.C. § 3161(h)(7), that the district court may exclude any delay resulting from a continuance granted *sua sponte* or on a motion of the parties, provided that "the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." *Id.* § 3161(h)(7)(A). "This

provision gives the district court discretion-within limits and subject to specific procedures-to accommodate limited delays for case-specific needs." *Zedner*, 547 U.S. at 499. Specifically, "[t]he Act requires that when a district court grants an ends-of-justice continuance, it must set forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice are served and they outweigh other interests." *Id.* at 506.

In this case, however, an express exclusion under § 3161(h)(7) was rarely made during the long series of delays. To be sure, "failure to utter the magic words 'ends-of-justice' at the time of ordering the continuance is not necessarily fatal." *United States v. Breen*, 243 F.3d 591, 597 (2d Cir. 2001). However, this Court has "stress[ed] that whenever possible the district court 'should make the findings required by [§ 3161(h)(7)] at the time it grants the continuance,'" *id.* (quoting *United States v. Tunnessen*, 763 F.2d 74, 79 (2d Cir. 1985)), and sufficient findings to support an ends of justice continuance "must be put on the record by the time a district court rules on a defendant's motion to dismiss," because "without on-the-record findings, there can be no exclusion" under § 3161(h)(7), *Zedner*, 547 U.S. at 506–07.

Among the non-exhaustive list of factors "which a judge shall consider" in determining whether the ends of justice are served by a continuance is "[w]hether

the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established" by the Act. 18 U.S.C. § 3161(h)(7)(B)(ii). It is this exclusion on which the Government here chiefly relies, citing in particular the original designation of the case as "complex." App'x at 88, 98.

A district court excluding time on the basis of complexity must "set forth the reasons why the case . . . continue[s] to be complex for purposes of the exclusion." *Gambino*, 59 F.3d at 358. Cases are "complex" where they, for example, involve numerous defendants, novel legal issues, myriad claims, or many necessary witnesses. *See, e.g.*, *United States v. Shellef*, 718 F.3d 94, 107 (2d Cir. 2013) (affirming designation of case as "complex" where the mandate from this court for retrial of an 86-count indictment "required the government to deconstruct [its already] complex case and reassemble it into three distinct trial presentations"); *Gambino*, 59 F.3d at 356, 358 (discussing "complexity" of RICO prosecution "involving hundreds of hours of video and audio tape recordings tracking the structure and criminal activities of" "one of the most notorious organized crime

families in the United States"); *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1197–98 (2d Cir. 1989) (affirming exclusion of time on the basis of complexity where "extensive scientific evidence and thousands of documents" were used to prosecute "eight defendants [on] 470 counts, requiring proof of more than 2,500 separate offenses at [the three-month] trial," which commenced one year after arraignments). While we doubt that a case can be designated as "complex" solely because it involves a lot of documents, what is obvious is that any such supposed complexity cannot support a three-and-a-half year delay under the Speedy Trial Act when the cause of most of the delay is the Government's refusal to produce most of the documents.

We review the district court's findings of fact for clear error as they pertain to a Speedy Trial Act challenge, and we review its legal conclusions *de novo*. *United States v. Lynch*, 726 F.3d 346, 351 (2d Cir. 2013). Harmless error review does not apply to violations of the Speedy Trial Act. *Zedner*, 547 U.S. at 509.

B. <u>Analysis of Specific Speedy Trial Act Findings</u>

We first assess whether the district court's on-the-record findings were sufficient to exclude time for specific adjournments granted. As reflected in the above summary, often, the district court perfunctorily excluded time without

explanation. This clearly does not satisfy the Speedy Trial Act's requirement that a court must "set forth . . . its reasons for finding that the ends of justice are served and they outweigh other interests." *See Zedner*, 547 U.S. at 506. Occasionally, the Court referred back to the original designation of this case as complex, but we conclude that these brief, retrospective statements also fail to justify the delays here under the Speedy Trial Act, particularly because the court failed ever to explain on the record *why* the case was complex.

In *United States v. Zedner*, another case arising from the Eastern District of New York, the Supreme Court stated that "there can be no exclusion" based on the complexity of a case "without on-the-record findings" supporting such a designation under 18 U.S.C. § 3161(h)(7). 547 U.S. at 507. The Court rejected the practice of justifying an exclusion with only a "passing reference to the case's complexity." *Id*. But that proscribed practice is just what the district Court did here: the Court called the case "complex" without elaborating on the source or implications of that purported complexity. App'x at 88, 98, 478–79, 530, 948. While counsel for the Government at times tried to flesh out the record and demonstrate the complexity of the case due to the ongoing discovery issues, they did so by pointing to the difficulties attendant on their partner agencies' document

production. The *Government's* representations regarding the discovery delays in this case, do not satisfy the *district court's* Speedy Trial Act obligation to state its justifications for the interests-of-justice determination on the record. *Zedner*, 547 U.S. at 507; *United States v. Bert*, 814 F.3d 70, 80 (2d Cir. 2016) ("The [Speedy Trial] Act controls the conduct of the parties and the court itself during criminal pretrial proceedings. Not only must the court police the behavior of the prosecutor and the defense counsel, it must also police itself."). We decline to infer the district court's reasoning from the Government's statements.

Relying heavily on *United States v. Bikundi*, a case from another Circuit, the Government urges us to conclude that a review of the record as a whole, including the Government's statements and the parties' back-and-forth regarding the discovery production, satisfies the Speedy Trial Act's requirements. 926 F.3d 761 (D.C. Cir. 2019). We agree with *Bikundi* that to maintain a complexity designation, a district court need not "repeat all of the details of its findings on the record each time it grants an ends-of-justice continuance," if the district court "thorough[ly]" set forth its reasons when initially designating the case as complex and if "the circumstances [justifying the complexity designation remain] essentially unchanged." *Id.* at 777–78. Here, however, the district court never explained on

the record the basis for its initial "complex case" designation, so the *Bikundi* rule cannot rehabilitate the district court's inadequate complexity designations later on.

Further still, even when a case is undisputedly complex, complexity *per se* is not an excuse for "indefinite delay," *Beech-Nut Nutrition Corp.*, 871 F.2d at 1198, or "a means of circumventing the requirements of the Speedy Trial Act," *United States v. LoFranco*, 818 F.2d 276, 277 (2d Cir. 1987). Rather, the "length of an exclusion for complexity must be not only limited in time, but also reasonably related to the actual needs of the case." *Gambino*, 59 F.3d at 358. When the district court excluded time, it never made any record about why the case's purported complexity justified that particular adjournment or the overall delay in this case, findings that are necessary to support an adjournment for complexity. Under the circumstances, a wait of three-and-a-half years for trial was not appropriate.

With this framework in mind, we have no trouble concluding that the district court clearly erred in attributing the multi-year delays to the case being "complex," to "negotiations," and to "motions" when the Government's discovery conduct was the true cause of the delay. Our analysis focuses in particular on two

periods of delay, each of which prompted Speedy Trial Act motions by the defense, which were denied in conclusory fashion by the district court.[12]

### 1. *OMIG Subpoena*

First, we consider the period from May 3, 2017 to November 14, 2017, when Pikus was trying to obtain audit documents from OMIG and MFCU via subpoenas. During this period, the district court granted adjournments four times, never once expressly acknowledging that the case was on hold for this document production. At the status conference held May 3, 2017, the Government represented to the Court that it had "finished collecting" the audit materials and that HHS had produced all responsive audit documents—representations upon which the Court relied but that ultimately turned out to be inaccurate. App'x at 158. But prosecutors also stated that OMIG and MFCU were refusing to produce documents in response to the Government's requests and that Pikus would need

---

[12] Each of the two periods of delay discussed below resulted in more than 70 non-excluded days, and so each period independently exceeded the permissible delay under 18 U.S.C. § 3161(c)(1). However, we note that the Government conceded that the district court also neglected to exclude altogether 12 days in September and November 2016 resulting from rescheduled hearings and an additional 32 days between our September 25, 2019 order granting Pikus's petition for a writ of mandamus vacating the district court's bail revocation, *In re: Aleksandr Pikus*, No. 19-2891, Doc. 40 (2d Cir. Sept. 25, 2019), and the start of trial on October 28, 2019. Therefore, only 26 days of non-excludable delay from either of the two periods analyzed below would be required to result in a Speedy Trial Act violation.

to subpoena the agencies to obtain their audit documents and investigative files. Pikus formally moved for the subpoenas' issuance through a follow-up letter dated May 23, 2017, and the subpoenas were issued following the June 6, 2017 conference.[13] At both the May and June conferences, the Court stated simply, without any motion or on-the-record explanation, that "[t]ime is excluded." App'x at 166, 179. Even if we infer that it was obvious from the context that the adjournments were required for the state agencies to produce documents—a benefit of the doubt that would strain our precedent, *see Lynch*, 726 F.3d at 354 n.5 (district courts should make a contemporaneous record of findings supporting ends-of-justice exclusions)—the exclusions of time would still be improper. The Court nowhere indicated that it had weighed whether the ends of justice were served by delaying trial for months so that a state agency that had participated in the joint investigation of the defendant could begin the process of collecting and producing documents more than four months after the Government had committed to their production and requested the same materials.

---

[13] The 14-day period from May 23, 2017 to June 6, 2017 is automatically excludable under 18 U.S.C. § 3161(h)(1)(D) because Pikus's motion for issuance of the subpoenas was pending. *See Shellef*, 718 F.3d at 111–12.

By the September 12, 2017 conference—131 days after the May 3, 2017 status conference—the two state agencies had still not complied with the subpoenas, but they had told defense counsel to expect documents on September 26, 2017. As the conference wrapped up, the Court stated "Time is excluded," and remarked, "Your motions are still pending and negotiations." App'x at 207. This statement was clearly erroneous. There were no open motions at that time. And while the Government noted it was "in the process of making the final [plea] offers in this case," the record reflects that the Court was waiting for the discovery, not the negotiations, to take the next step and set pre-trial motion schedules. *Id.* at 206–07.

By the October 12, 2017 conference, Pikus's counsel reported that neither state agency had yet complied with the subpoenas, and he requested leave to make a motion to compel, even as the Government represented that it had fully complied with its Rule 16 obligations. The Court nonetheless set a schedule for the defense to make omnibus pre-trial motions and excluded time over the defense's objection, saying "The motions are pending. You're in negotiations." App'x at 222. Again, the record indicates that no motions were pending, the motion schedule was dictated by the discovery situation, and the Court had rejected the

Government's request to wait "30 or 45 days" to set a trial date "as plea negotiations continue."[14] App'x at 211, 215.

We therefore conclude that there were 181 non-excludable days between May 3, 2017, when the case was delayed due to the Government's failure to obtain audit documents from OMIG and MFCU, and November 14, 2017, when Pikus filed his motion to dismiss, *see* 18 U.S.C. § 3161(h)(1)(D); *Shellef*, 718 F.3d at 111–12 (filing of pre-trial motion triggers automatic exclusion of time). Because this is more than twice the Speedy Trial Act's permissible limit of 70 non-excluded days before trial, the district court should have granted Pikus's motion to dismiss, and its February 12, 2018 memorandum order must be reversed. This alone would suffice to vacate Pikus's sentence.

2. *HHS Subpoena*

There was at least one other period of delay resulting from the Government's conduct in discovery that also should have led to dismissal of the indictment: the period from August 7, 2018 (when we denied Pikus's pending

---

[14] According to Appellant's brief, there were no ongoing plea negotiations with Pikus at the time. But even if we were to accept the Court's finding that the delay during this period was attributable to plea negotiations with Pikus, and not only with his co-conspirators, it would not change the outcome, since the Court first offered that rationale on September 12, 2017, after 131 non-excludable days had then elapsed since May 3, 2017.

mandamus petition) through October 22, 2018 (when Pikus's co-defendant filed a motion). The Court had previously set a trial date of May 15, 2018, which was nearly two years after Pikus was arrested, and more than one year after the prosecutors represented to the court that HHS had produced all responsive documents. But on April 18, 2018, less than one month before the scheduled trial, the Government disclosed that a subpoena from one of the *Bakry* defendants had spurred HHS to identify more audit documents that were relevant to Pikus, and they would be produced to Pikus "close in time to, during, or even after the trial." App'x at 386. When the Court finally convened a conference one week before the trial, Pikus had moved for issuance of a trial subpoena. The Government opposed this request at the hearing, arguing that the subpoena was broader than the original discovery agreement, even though its letter brief in opposition to the motion correctly stated that "the proposed Subpoena seeks largely the same documents as the Agreed Requests" from December 2016. App'x at 448; *compare* App'x 396–97 *with* 123–27. Eventually, the Government conceded that the trial would have to be adjourned, and the Court set a new trial date of October 1, 2018.

At the May 10, 2018 conference, the Court excluded time through October 1, 2018 on the Government's motion, with the prosecutor repeating that the "case

was designated as complex" and "what you see here[] is an example of exactly that type of complexity. There's voluminous discovery." App'x at 478. Pikus objected. Though the Court prevented counsel from making a full record, counsel stated that "[t]his is not a proper designation of a case that's complex," and argued that the discovery delays were "the fault of the government." App'x at 479.

We agree. Leaving aside the state agencies' documents, which are addressed above, the Government repeatedly and inaccurately represented to the Court that it had completed discovery and that HHS had produced all audit documents called for by the December 2016 discovery agreement. Yet, two years after Pikus's arrest, the May 15, 2018 trial date was adjourned due to HHS's delayed and haphazard production. Had the Government directed HHS to undertake fuller collection and production of its audit documents as agreed, there would have been no need for the agency to scramble to produce documents two years after Pikus's arrest, and no need to adjourn the May 15, 2018 trial date.[15]

---

[15] We do not address whether the disputed audit documents constituted *Brady* material, or whether Pikus was entitled to them over the Government's objection. The delays described above arose from the Government's failure to produce documents it agreed to produce, or represented that it had already produced when, in fact, it had not.

Moreover, even if one were to suppose that the case was complex due to the ongoing and convoluted discovery proceedings, the Court's mere "passing reference to the case's complexity," *Zedner*, 547 U.S. at 507, and its failure to articulate why the further delay was "reasonably related to the actual needs of the case," *Gambino*, 59 F.3d at 358, render the record inadequate to support the exclusion of time. The district court thus failed to provide a sufficient basis for excluding time to October 1, 2018, and the non-excludable days began accruing as soon as we denied Pikus's pending petition for a writ of mandamus on August 7, 2018.[16]

The court continued to exclude time erroneously based on the unexplained "complexity" of the case after the May 10, 2018 conference. After the summer passed without a production from HHS, the Court held a status conference on September 6, 2018, at which an HHS representative estimated it would take four to six more weeks to produce documents. The Court rejected this timeline as too

---

[16] On April 17, 2018, Pikus filed in this court a petition for a writ of mandamus to require the district court to dismiss the indictment on speedy trial grounds. We denied that petition on August 7, 2018. *In re: Aleksandr Pikus*, No. 18-1109, Doc. 29 (2d Cir. Aug. 7, 2018). We assume without deciding that this period was automatically excludable as an "interlocutory appeal," 18 U.S.C. § 3161(h)(1)(C), though we note that the district court here did not "delay[] the trial to await the outcome of the mandamus action." *See United States v. Tyler*, 878 F.2d 753, 759–60 (3d Cir. 1989) (excluding time during pending petition for writ of mandamus where the district court awaited decision on the petition).

slow but denied Pikus's application for a hearing on the cause of HHS's delay and took no other concrete action to speed discovery. The Court ultimately adjourned the trial to January 28, 2019. Again, the Government cited the "request for documents" as "one of those features of the complexity" of the case and moved for exclusion of time through the new trial date. App'x at 529–30. When Pikus's counsel asked whether "the adjournment [was] being made because they have failed to produce the documents," the Court ignored him, saying "Time is excluded. It is a complex case." App'x at 530.

Again, the Court perfunctorily stated the case was complex, and failed to fully articulate its interests-of-justice determination. *Zedner*, 547 U.S. at 506; *Gambino*, 59 F.3d at 358. Therefore, the 46 days from September 6 through October 22, 2018, when Pikus's co-defendant filed a motion related to material in an HHS production, were not properly excluded.[17]

---

[17] It is true "that in cases involving multiple defendants [whose trials have not been severed] only one speedy trial clock, beginning on the date of the commencement of the speedy trial clock of the most recently added defendant, need be calculated" and "[i]n this computation, a delay attributable to any one defendant is chargeable only to the single controlling clock." *United States v. Piteo*, 726 F.2d 50, 52 (2d Cir. 1983). However, to appropriately exclude time for plea negotiations in a multi-defendant case, the district court should make clear on the record which defendants are engaged in negotiations and determine whether severance would be possible or appropriate. We also reject the Government's suggestion at oral argument that long periods of time may be summarily

In sum, the record provides no indication that the district court adequately considered whether the ends of justice were served by adjourning Pikus's trial for the 76 days between August 7, 2018 and October 22, 2018. Since this period is again more than the 70 non-excludable days permitted by the Speedy Trial Act, it independently justified dismissal of the indictment when Pikus orally renewed his motion to dismiss just before jury selection commenced. We therefore reverse the district court's denial of Pikus's second motion to dismiss under the Speedy Trial Act.

## III.   CONCLUSION

The Speedy Trial Act was designed to enforce the Sixth Amendment's guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." U.S. CONST. amend. VI. "The prosecutor, defense counsel, and the court each plays a role in insuring that the interests of the public and the defendant in a speedy trial are protected." *United States v. Stayton*, 791 F.2d 17, 20 (2d Cir. 1986). Under this structure, the district court "[n]ot only must . . . police the behavior of the prosecutor and the defense counsel, it must also police itself."

---

excluded for "negotiations" in a multi-defendant case just because guilty pleas for co-defendants were reached at various points throughout the pre-trial proceedings.

*Id.* Throughout the pre-trial proceedings below, the district court failed in this responsibility. It neither held the Government accountable for its discovery obligations nor appropriately considered the causes and implications of the extraordinary delays introduced by the Government's dilatory conduct of discovery. "[T]he best interests of the public and the defendant in a speedy trial" demand more. 18 U.S.C. § 3161(h)(7)(A).

We therefore **REVERSE** the district court's denials of both of Pikus's motions to dismiss under the Speedy Trial Act and **REMAND** with directions to **VACATE** Pikus's convictions and to determine whether the pending charges should be dismissed with or without prejudice.[18]

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

---

[18] While dismissal of the indictment is the mandatory sanction for a violation of the Speedy Trial Act's time limits, "[t]he determination of whether to dismiss an indictment with or without prejudice is committed to the discretion of the district court." *Bert*, 814 F.3d at 79 (alteration in original).